UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

JOANN COOPER, individually
and as next friend of D.C.,[1]

    Plaintiff,

vs.                                                        Case No.: 3:10-cv-695-J-12TEM

JOHN RUTHERFORD, in his official capacity
as Sheriff of the Consolidated City of Jacksonville
and Duval County, Florida,

    Defendant.

_____

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs bring this action seeking monetary damages, attorney's fees, and costs against the Defendants and allege as follows:

1. This is an action for damages, attorney's fees, and costs for the deprivation of Plaintiffs' rights secured by the Fourth and Fourteenth Amendments to the Constitution of the United States as well as claims under Florida law.

### JURISDICTION AND VENUE

2. Plaintiffs invoke the jurisdiction of this Court pursuant to 42 U.S.C. §§1983 and 1988 and 28 U.S.C. §§1331 and 1343. The Court has supplemental jurisdiction as to the state law claims pursuant to 28 U.S.C. §1367.

3. Venue in this district is proper pursuant to 28 U.S.C. §1391, in that the cause of action arose in this district.

___

[1] Plaintiff is designated by a pseudonym to protect the privacy of the minor child pursuant to Fed.R.Civ.P. 5.2(a).

## PARTIES

4.  Plaintiff, Joann Cooper, is an adult resident of Jacksonville, Duval County, Florida.

5.  Plaintiff, D.C., is a minor and is the son of Joann Cooper and a resident of Jacksonville, Duval County, Florida.

6.  Defendant, John Rutherford, in his official capacity as Sheriff of the Consolidated City of Jacksonville and Duval County, Florida, was, at all times relevant, responsible for the supervision, training, instruction, discipline, control, and conduct of police officers of the Jacksonville Sheriff's Office ("JSO"), and further makes policy for JSO with respect to the use of force. At all times relevant, Defendant John Rutherford had the power, right and duty to train and control his officers, agents, and employees to conform with the Constitution of the United States and to ensure that all orders, rules, instructions and regulations promulgated for JSO were consistent with the Constitution of the United States. At all times relevant to this Complaint, Defendant Sheriff Rutherford, his agents, and employees acted under color of State law.

## FACTUAL ALLEGATIONS

7.  On Friday, March 26th, 2010, at approximately 3:09 p.m., JSO dispatched its officers to respond to a report of a bank robbery at the Wachovia Bank at 8715 Baymeadows Road in Jacksonville, Florida, by a suspect described as a black male, wearing black clothing and armed with a gun.

8.  Approximately sixteen officers, and one off-duty officer who was performing a secondary job in his police uniform, Officer York, responded.

9. From 3:09 until 3:26 p.m., at least six more officers were dispatched to various areas surrounding the scene for "traffic control" purposes.

10. Officer York arrived at the scene and followed the suspect on foot through an Office Depot parking lot to a Wendy's restaurant located at 8625 Baymeadows Road.

11. Officer Sciandra, also of JSO, from his motorcycle, saw the suspect in the Office Depot parking lot and transmitted a description over the police radio.

12. Officer Jones, also of JSO, saw the suspect in the Office Depot parking lot and transmitted over the police radio that he saw the suspect.

13. As the lone suspect moved through the Office Depot parking lot, he was witnessed by at least four JSO officers: York, Jones, Santoro, and Sciandra.

14. Officer York took a shooting stance and shouted to the suspect: "Police, don't move!" and "I will shoot you!"

15. The suspect ran and Officer York saw a gun in the suspect's hand and reported this fact on his police radio.

16. Officer Santoro drove his car into the Wendy's parking lot to "try and intercept the suspect" and then parked the car.

17. Officer York followed the suspect to Wendy's.

18. Officer York observed another officer running towards the location and shouted: "Gun, gun, the suspect is armed!"

19. JSO Officer Lederman arrived at the scene and parked behind another police car in the Wendy's parking lot.

20. Plaintiffs Joann Cooper and D.C. were in Ms. Cooper's automobile at the drive-through window at the Wendy's restaurant when the suspect started to force his way into her car.

21. Officer York, who had been following the suspect, shouted: "Stop!", "Police, don't move!" and "I will shoot you!"

22. Officers Black and Griffith heard about the robbery through the police dispatch and parked their patrol car near the Wendy's.

23. As Officer Black exited his vehicle, he saw an officer with his gun drawn, but not firing, and another officer pointing a shotgun toward the drive through lane.

24. Officer York observed the suspect trying to get into Cooper's car at the drive through window and yelled: "Stop!" and "Show me your hands!"

25. As the suspect tried to force his way into the car, Officer York heard the driver screaming and heard the suspect state: "I'm going to shoot you."

26. Officer Black heard someone say: "He's taking the car, he's taking the car."

27. Officer Black asked Officer Jones, whom he was standing next to, "what car the suspect was taking since [he] did not have a visual yet."

28. Officer Jones saw the suspect attempt to force a woman over to the automobile's passenger seat and Officer Jones saw a child in the backseat.

29. Officer Black was standing next to Officer Jones and saw what Officer Jones saw.

30. Officer Jones observed people in the car in addition to the suspect and held his fire, but did not speak to Officer Black.

31. Ms. Cooper successfully struggled to take the gun away from the suspect and the gun fell to the floorboard of her car.

32. Officer Black concluded the suspect was still armed and had carjacked a citizen.

33. Officer York fired his shotgun twice toward the open car door.

34. As Officer Santoro exited his car, he heard gunshots.

35. As Officer Lederman exited his vehicle, he heard shots fired, and heard an officer over the police radio say "shots fired."

36. Officer Black heard a single gunshot and concluded the suspect had shot his weapon because he did not see the suspect wince.

37. Officer Jones, standing in a similar position to Officer Black, realized that Officer York had fired his weapon and that the suspect had not fired a weapon.

38. Plaintiff Cooper could clearly see an officer aiming a gun at her car from her seat-belted position in the driver's seat of the car.

39. Officer Black fired into the car.

40. Officer Griffith fired into the car.

41. Officer York fired at the car.

42. Officers Santoro, Lederman, Sciandra, and Dingler saw two officers firing into the car.

43. Despite his awareness of persons other than the suspect in the car, Officer Jones did not tell Officer Black to stop firing into the vehicle.

44. Officers Dingler, Jones, Santoro, Sciandra, and Lederman did not fire their weapons.

45. Officer York yelled "Don't shoot, there are hostages in the car!"

46. As Officer Lederman moved for cover, he saw the children in the car through the window.

47. Officer Lederman yelled, "Stop firing, cease fire, stop firing there is a kid in the car!"

48. Officer Santoro heard an officer yell: "Stop firing, cease fire, stop firing there is a kid in the car!"

49. Officer York heard an officer yell: "Stop firing, cease fire, stop firing there is a kid in the car!"

50. Officer Griffith heard an officer yell: "Stop firing, cease fire, stop firing there is a kid in the car!" and stopped firing.

51. Officer Black, having expended all rounds of ammunition in the magazine of his gun, reloaded his gun.

52. Ms. Cooper's car began moving forward.

53. Officer Dingler did not fire at the car because he could not see who was inside.

54. Officer Black shot at the car while it was moving past him.

55. Two other vehicles were in front of Ms. Cooper's car as it started to move forward.

56. More than ten other JSO officers were located in the immediate vicinity of Ms. Cooper's car and several more nearby were engaged in traffic control.

57. The suspect attempted to exit the vehicle.

58. Officers Santoro, Lederman, Black and Griffith saw the suspect's left hand was empty, but could not see the suspect's right hand, and did not see a gun in his possession because the gun was on the floorboard of the car.

59. Officer Lederman fired four times at the vehicle.

60. Officer Santoro fired four times at the vehicle.

61. Officers Griffith and Black fired until the suspect fell.

62. In all, Officer York fired four times, Officer Santoro fired four times, Officer Lederman fired four times, Officer Griffith fired six times, and Officer Black fired twenty-four times.

63. Plaintiff Joann Cooper and her son Plaintiff D.C. were struck by bullets fired from JSO firearms.

64. As a result of the police shooting described above, Joann Cooper was shot in the right foot and has had repeated surgeries on her foot including the installation of a metal plate.

65. As a result of the police shooting described above, D.C. was shot in the arm and upper torso and was rushed to the hospital in critical condition with life threatening injuries including a collapsed lung and multiple fractures.

66. There exists a widespread practice of members of the Jacksonville Sheriff's Office shooting citizens under circumstances where such shootings were unjustified, for example:

    a. On January 15, 2007, JSO fatally shot mentally ill Vietnam War veteran Harry Shuler. The then State Attorney stated of the events: "[i]t appear[ed], since he exited unarmed and was moving peacefully to the large number of police, he was surrendering ... If

police had taken no aggressive actions, it appears very clear the confrontation would have ended without anyone firing a weapon."

   b. On January 27, 2007 undercover JSO officers posing as drug dealers shot and killed Issac Singletary in front of his home as Mr. Singletary attempted to prevent drug dealing on his property. Mr. Singletary believed the officers to be drug dealers and it was not until after the officers shot Mr. Singletary, did the officers discover Mr. Singletary had a gun. The then State Attorney stated Mr. Singletary's death "could have been avoided." The JSO officers involved were not disciplined nor required to undergo additional training.

   c. On February 21, 2008, despite not seeing a weapon, JSO shot Kenneth Bernard Marion, who was unarmed at the time he fled from an encounter with members of JSO. Shooting Marion was clearly unnecessary as other suspects were stopped without being shot.

   d. On March 25, 2008, JSO fatally shot Sierra White, a mentally ill person, in an incident that caused the then State Attorney to state "many questions exist as to whether or not this severely mentally ill non-criminal had to die." The officers involved were responding to a mental health worker's request for help administering medicine, not to a crime scene.

   e. On June 23, 2008, despite not seeing a weapon, JSO fatally shot Artavious Debose who had just crashed and flipped the vehicle in which he was traveling. Debose was unarmed at the time and had stopped fleeing from police when he was shot.

   f. On July 29, 2008, despite not seeing a weapon, JSO fatally shot Brian T. Brock as he fled. Police did not find a gun at the scene.

   g. On October 26, 2008, despite not seeing a weapon, JSO shot seventeen year old Dutch Stafford as he lay on the ground after the car in which he was traveling crashed

into a culvert.

    h.    On October 27, 2008, despite not seeing a weapon, JSO shot nineteen year old Jerrick Hall, as he was entering a residence for which he had permission to enter at the time of the shooting, was unarmed, and had one paralyzed arm.

    i.    On October 28, 2008, despite not seeing a weapon, JSO shot sixteen year old Tyron Taylor as he was scaling a fence. Taylor did not have a gun nor did police find a gun at the scene. The JSO officer who shot Mr. Taylor was not disciplined nor required to undergo any additional training.

    j.    On June 15, 2009, JSO officers shot Kiko Battle nine times after tasering him. JSO initially approached Battle to give him a citation for walking in the middle of the street and did not observe Battle to have a weapon at the time of the shooting. The JSO officers involved were not disciplined nor required to undergo additional training.

    k.    On July 16, 2010, JSO officers fatally shot Michael Blakeney. The vehicle in which Blakeney was traveling was reported stolen approximately one and a half hours prior to the shooting. After JSO chased the vehicle, the vehicle came to a stop. Thereafter, JSO officers fired multiple times into the stopped vehicle despite the fact that no shots were fired from the vehicle.

    67.    Furthermore, the Jacksonville Sheriff's Office has a higher incidence of police shootings than many cities of comparable size. For example, since 2007, Jacksonville has more than double the police shootings of Miami, Tampa and Orlando. *See* "Police Shootings Rise: Some are Asking Why So Many," by Matt Galnor, <u>Florida Times-Union</u>, published Sunday, April 6, 2008.

68. Specifically, from 2007 until April 2008 Jacksonville had 27 police shootings, while the other three cities combined had 23.

69. Also, of the 29 officers involved in the 2007 shootings, only six were ordered for additional training, and none of the cases were tagged for investigation. The training simply consisted of meeting with a superior officer.

## COUNT I
## UNREASONABLE SEIZURE
## (Municipal Liability)

70. Paragraphs 1 through 69, above, are hereby adopted and incorporated by reference herein.

71. The conduct of the JSO officers in firing at and into Ms. Cooper's vehicle constituted an unreasonable seizure of Ms. Cooper and D.C..

72. Defendant Sheriff Rutherford, his agents and employees, acting within their authority and under color of State law, instituted and followed customs, practices and policies which directly resulted in the unreasonable seizure of Joann Cooper's and D.C.'s persons, which is actionable under 42 U.S.C. §1983, as a violation of the Fourth and Fourteenth Amendments to the Constitution of the United States. Additionally, by failing to adequately discipline his officers for their actions and inactions, Defendant Sheriff Rutherford has ratified his officers' decisions and their reasons for those decisions, thus constituting a policy, custom, or practice. Alternatively, the officers acting on the scene were the final policymakers for Defendant Sheriff Rutherford as their decisions were not immediately or effectively reviewable. Additionally, Defendant Sheriff Rutherford failed to adequately train his agents and employees with respect to the use of deadly force in and around civilians and in situations involving vehicles, despite a

clear and obvious need for such training, reflecting a deliberate indifference to the constitutional rights of Plaintiffs Joann Cooper and D.C., thus constituting a policy, custom, or practice. Additionally, there exists a widespread practice by which members of JSO shoot citizens under circumstances where such shootings were unjustified. The aforementioned customs, practices and polices were the moving force of the constitutional deprivations suffered by Plaintiffs.

73. As a direct and proximate result of the Defendant Sheriff Rutherford's actions and inactions, Joann Cooper and D.C. suffered damages, including but not limited to, loss of enjoyment of life, severe pain and suffering, physical injuries, monetary losses, severe emotional and psychological distress, and other damages.

WHEREFORE, Plaintiffs demand judgment against Defendant Sheriff Rutherford in his official capacity for:

(a) Actual and compensatory damages;

(b) An award of attorney's fees and costs; and

(c) Any other relief that this Court deems just and proper.

## COUNT II
## DEPRIVATION OF LIBERTY WITHOUT DUE PROCESS
### (Substantive Due Process - Municipal Liability)

74. Paragraphs 1 through 69, above, are hereby adopted and incorporated by reference herein.

75. The conduct of the JSO officers in firing at and into Ms. Cooper's vehicle either with knowledge or in willful ignorance of the fact that persons other than the suspect were inside, was intended to cause harm unjustifiable by any government interest, shockingly offends a universal

sense of justice and conscience, and deprived Joann Cooper and D.C. of their liberty without due process of law.

76. Defendant Sheriff Rutherford, his agents and employees, acting within their authority and under color of State law, instituted customs, practices, and/or policies that violated fundamental fairness, shocking to the universal sense of justice and conscience, which directly resulted in serious bodily injury and in the deprivation of Joann Cooper and D.C.'s liberty without due process of law, which is actionable under 42 U.S.C. §1983, as a violation of the Fourteenth Amendment to the Constitution of the United States. Additionally, by failing to adequately discipline his officers for their actions and inactions, Defendant Sheriff Rutherford has ratified the officers' decisions and their reasons for those decisions, thus constituting a custom, practice and/or policy. Alternatively, the officers acting on the scene were the final policymakers for Defendant Sheriff Rutherford as their decisions were not immediately or effectively reviewable. Additionally, Defendant Sheriff Rutherford failed to adequately train his agents and employees with respect to use of deadly force in and around civilians and in situations involving vehicles, despite a clear and obvious need for such training, reflecting deliberate indifference to the constitutional rights of Plaintiffs Joann Cooper and D.C., thus constituting a custom, practice and/or policy. Additionally, there exists a widespread practice by which members of JSO shoot citizens under circumstances where such shootings werer unjustified. The aforementioned customs, practices and policies were the moving force of the constitutional deprivations suffered by Plaintiffs.

77. As a direct and proximate result of the Defendant Sheriff Rutherford's actions and inactions, Joann Cooper and D.C. suffered damages, including but not limited to, loss of enjoyment of life, severe pain and suffering, physical injury, monetary losses, severe emotional and

psychological distress, and other damages.

    WHEREFORE, Plaintiffs demand judgement against Defendant Sheriff Rutherford for:

    (a)    Actual and compensable damages;

    (b)    An award of attorney's fees and costs; and

    (c)    Any other relief that this Court deems just and proper.

## COUNT III
## STATE LAW CLAIM: BATTERY

78.    Paragraphs 1 through 69 above are realleged and incorporated by reference herein.

79.    Plaintiffs Cooper and D.C. have satisfied all conditions precedent to bringing this action as required pursuant to §768.28, Fla. Stat. (2010) and §§112.201-112.205, Jacksonville Ordinance Code.

80.    Employees of the Jacksonville Sheriff's Office actually and intentionally struck Plaintiffs Cooper and D.C. against their will, without legal justification.

81.    Sheriff Rutherford, having given his officers the authority to use force against Plaintiffs Cooper and D.C., is liable for use of such authority.

82.    Plaintiffs Cooper and D.C., as a result of the JSO officers' battery and abuse of their authority, suffered severe pain and suffering, physical injuries, monetary loss, mental anguish and emotional distress.

    WHEREFORE, Plaintiffs demand judgment against Sheriff Rutherford in his official capacity as Sheriff of the City of Jacksonville for:

    (a)    actual and compensatory damages;

    (b)    costs; and

(c) any other relief this court deems just and proper.

## COUNT IV
## STATE LAW CLAIM: NEGLIGENCE

83. Paragraphs 1 through 69 above are realleged and incorporated by reference herein.

84. Plaintiffs Cooper and D.C. have satisfied all conditions precedent to bringing this action as required pursuant to §768.28, Fla. Stat. (2010) and §§112.201-112.205, Jacksonville Ordinance Code.

85. Employees of the Jacksonville Sheriff's Office owed a duty to Plaintiffs Cooper and D.C. to use reasonable care in performing their duties as police officers, including, but not limited to, handling, utilizing, and using their firearms, so as to not cause harm to the Plaintiffs.

86. Moreover, the employees of the Jacksonville Sheriff's Office placed Plaintiffs into and/or created a foreseeable zone of risk when firing at and into the vehicle in which the Plaintiffs were located.

87. Employees of the Jacksonville Sheriff's Office breached the duty owed to Plaintiffs by carelessly and negligently firing multiple shots at and into a vehicle containing the Plaintiffs.

88. As a result of the negligence of the Jacksonville Sheriff's Office, Plaintiffs suffered damages, including but not limited to, loss of enjoyment of life, severe pain and suffering, physical injury, monetary losses, severe emotional and psychological distress, and other damages.

WHEREFORE, Plaintiffs demand judgment against Defendant Rutherford, in his official capacity as Sheriff of the City of Jacksonville, for:

(a) actual and compensatory damages;

(b) costs; and

(c) any other relief this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury on all issues so triable.

Respectfully submitted,

_____
Wm. J. Sheppard, Esquire
Florida Bar No.: 109154
Elizabeth L. White, Esquire
Florida Bar No.: 314560
Matthew R. Kachergus, Esquire
Florida Bar No.: 503282
Bryan E. DeMaggio, Esquire
Florida Bar No.: 055712
Jonathan W. Graessle, Esquire
Florida Bar No.: 102640
Sheppard, White & Kachergus, P.A.
215 Washington Street
Jacksonville, Florida 32202
Telephone:   (904) 356-9661
Facsimile:   (904) 356-9667
Email:       sheplaw@att.net
COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished to **Stephen J. Powell, Esquire**, Office of General Counsel, City of Jacksonville, 117 W. Duval Street, Suite 480, Jacksonville, Florida 32202-3734, by U.S. Mail and Electronic Mail, this 26th day of November, 2013.

_____
ATTORNEY

mlh[cooper -amnd complaint]