# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

**JOANN COOPER, individually,**
**and as next friend of D.C.,**

      **Plaintiff,**

**vs.**                                              **Case No.: 3:10-cv-00695-J-20PDB**

**MIKE WILLIAMS, in his official**
**capacity as Sheriff of the Consolidated**
**City of Jacksonville and Duval County,**
**Florida, et al.,**

      **Defendant.**

---

## PLAINTIFFS' RESPONSE TO DEFENDANT SHERIFF WILLIAMS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, Joann Cooper, individually, and as next friend of D.C., hereby responds to Defendant Sheriff Williams' Motion for Summary Judgment and Supporting Memorandum of Law (Doc. 97) ("Motion"). This case arises from the shooting into a motor vehicle forty-two (42) times by members of the Jacksonville Sheriff's Office ("JSO") in an effort to stop the automobile and apprehend a suspect who had just fled the commission of an armed bank robbery. When the officers shot into the vehicle, the suspect was actively engaging in a carjacking in which a mother and her two small children were trapped inside the car. Tragically, although predictably, Plaintiff and her two-year-old son were shot by police officers, both suffering extensive damage. The issue before the Court is whether: there exists sufficient facts that 1) Plaintiff and her son suffered a constitutional violation, *to wit*; an unreasonable seizure and substantive due process violation; 2) JSO maintained a policy, custom or practice that caused the constitutional violation; and 3) the State law claims may proceed, if the Court exercises jurisdiction over such claims.  As set forth

below, there exists genuine issues of material fact which preclude summary judgment.

Accordingly, Defendant's Motion for Summary Judgment should be denied.

## I.    Facts

On Friday, March 28, 2010 around 3 p.m., police officers of JSO responded to an armed bank robbery that was occurring at Wachovia Bank on Baymeadows Road. JSO Internal Affairs Summation in Case No. 2010-00385 ("I.A. Summation") at 1.[1] The suspect fled the Wachovia Bank via foot to a nearby Wendy's, also located on Baymeadows Road. *Id.* Police responded to the area in an attempt to locate the suspect. *Id.*

Around the same time, Ms. Cooper was at the Wendy's drive-through with her two-year-old son and seven-year-old daughter. Deposition of Joann Cooper, taken April 21, 2014 ("Cooper Depo.") at 12, 13, 31-33.[2] While at the window of the drive-through lane, Ms. Cooper saw a male, later identified as the bank robbery suspect, Jeremiah Mathis, approaching the front fender of her car. *Id.* at 40. Mathis came to Ms. Cooper's door and ordered Ms. Cooper out of the car, which she initially refused to do. *Id.* at 44. Ms. Cooper offered for Mathis to take the vehicle, but told him she would first need to remove her children. *Id.* at 45. Mathis then raised his firearm and told her he was going to kill her. *Id.* at 47.

Lt. York arrived at the scene and observed Mathis attempting to take Ms. Cooper's automobile. Deposition of Jesse York, taken January 11, 2012 ("York Depo.") at 86-87.[3] Inside the car, Ms. Cooper began fighting Mathis and knocked his gun away from him and onto the

---

[1] The JSO Internal Affairs Summation in Case. No. 2010-00385 was previously filed by Defendant Mike Williams as an exhibit to his Motion for Summary Judgment. *See* (Doc. 99-33).

[2] Ms. Cooper's deposition was previously filed by Defendant Mike Williams as an exhibit to his Motion for Summary Judgment. *See* (Doc.99-2).

[3] Lt. York's deposition was previously filed by Defendant Mike Williams as an exhibit to his Motion for Summary Judgment. *See* (Doc.99-3).

floorboard of the passenger's seat. Cooper Depo. at 51, 53; Plaintiff's Composite Exhibit 1,

photographs of interior of car and gun during incident. As the gun bounced away, Ms. Cooper

heard a shot. Cooper Depo. at 54. Lt. York had fired his shotgun at the vehicle. York Depo. at 115.

Shortly thereafter, Lt. York fired another time at the car. *Id.* Lt. York had no training on how to

deal with a carjacking situation. *Id.* at 110. Further, Lt. York had no knowledge of any Jacksonville

Sheriff's Office policy relating to shooting a non-moving vehicle. *Id.* at 54. However, the

Jacksonville Sheriff's Office has a policy prohibiting the shooting into a moving vehicle, except

"as a last resort when all other opportunities have been exhausted, to prevent death or great bodily

harm to the officer or another person," or "to prevent the escape of a fleeing felon who would pose

an imminent threat of death or great bodily harm." *See* JSO Operational Order 6.01.24 (Response

to Resistance Order) at 48.[4] Otherwise, the JSO deadly force policy, as implicated in the facts of

this situation, merely directs officers to "exercise reasonable caution in order to avoid

unnecessarily endangering the lives of bystanders, when possible, officers should give

consideration to the backdrop, bystanders, and location." *Id.* at 49, § XVIII. C.5.; Hackney Depo.

at 30-32. However, none of the training regarding JSO's policy of shooting into a moving vehicle

(or rather not shooting into a moving vehicle), cautions the officers to consider backdrop and

bystanders. Hackney Depo. at 73-75. Furthermore, while JSO's policy appears to permit the use

of shotguns, training materials prepared near the time of the events in question prohibit the use of

shotguns. Hackney Depo. at 77-81, Exhibit 7. As stated above, York fired four rounds from his

shotgun,[5] and Officer Jones retrieved his shotgun from his vehicle to use, but never fired any

---

[4] The JSO Operational Order 6.1.24 (Response to Resistance) was previously filed by Defendant Mike Williams as an exhibit to his Motion for Summary Judgment. *See* (Doc. 99-9).
[5] Officer Lederman opined that he believed Ms. Cooper was shot in the foot by one of the rounds discharged from the shotgun. Lederman Depo. at 65. This is consistent with York's testimony that one of his shots struck the left front tire of the vehicle. York Depo. at 118.

rounds. Jones RTR at 4. When York fired his shotgun at the vehicle, he struck the control panel of the driver's door, causing the rear window next to Ms. Cooper's son to lower. *See* Plaintiff's Exhibit 2, Transcribed Response to Resistance Board Testimony of Warren Smith ("Smith RTR") at 21.

Darries Griffith, a Jacksonville Sheriff's Officer recruit, who was three to four months into the field training phase, arrived on scene with Ryan Black, his field-training officer ("FTO"), who had been on the force for six years with very little experience as an FTO. *See* Deposition of Darries Griffith taken June 27, 2014 ("Griffith Depo.") at 29, 41.[6] Prior to arriving at the scene, Recruit Griffith and Ryan Black, had no discussions about their course of action or how Recruit Griffith should proceed upon arriving at the scene. *See* Plaintiff's Exhibit 3, Jacksonville Sheriff's Office Response to Resistance Board Testimony of Ryan Black ("Black RTR") at 2, 35-36, *see also* Plaintiff's Exhibit 4, Transcribed Response to Resistance Board Testimony of Darries Griffith ("Griffith RTR") at 8, 14. Black did not advise Recruit Griffith to stay with him when they arrived at the scene. *See* Deposition of Ryan Black taken May 30, 2014 ("Black Depo.") at 33.[7] There were also no discussions about what to do if the suspect was armed. Griffith RTR at 8.

Upon Officers Black and Griffith's arrival, Griffith observed multiple police vehicles at the drive-through exit and Lt. York at the rear of Ms. Cooper's vehicle. Griffith Depo. at 42. After Lt. York's first shot, Griffith started firing at the driver of the vehicle. *Id.* at 60; Griffith RTR at 6, 24. Griffith incorrectly believed the shot came from the suspect. Griffith Depo. at 51. Griffith shot twice at the stationary vehicle. *Id.* at 62. None of the training Griffith received having just left the

---

[6] Mr. Griffith's deposition was previously filed by Defendant Mike Williams as an exhibit to his Motion for Summary Judgment. *See* (Doc.99-5).

[7] Mr. Black's deposition was previously filed by Defendant Mike Williams as an exhibit to his Motion for Summary Judgment. *See* (Doc.99-4).

academy, involved shooting into vehicles, nor was he aware of any policy on shooting into vehicles, let alone occupied vehicles. *Id.* at 26, 33, 35. Officer Griffith had no recollection of hostages or people being in the car. Griffith RTR at 13. He intentionally fired into it with thoughts of hitting the suspect. *Id.* at 21.

Officer Black, despite being aware that a carjacking was occurring, claims to have never saw the victims or asked where the victims of the carjacking were. Black RTR at 44. Instead, he proceeded to fire thirteen times into the car, claiming through its windshield, while the vehicle was stationary in the drive-thru line at Wendy's. *Id.* at 62. "I fired an unknown amount of rounds through the front windshield..." *Id.* at 10. He too, believed the suspect was responsible for the initial shot (Black Depo. at 37), despite Officer Jones, an officer standing immediately next to Black testifying that he didn't believe the suspect could have been firing, as he was observing the suspect attempting to enter the car. *See* Plaintiff's Exhibit 5, Transcribed Response to Resistance Board Testimony of Willie Jones ("Jones RTR") at 9. Jones also clearly saw the hostage in the car while standing next to Black, as well as the girl in the backseat. *Id.* at 9-10. Jones did not report this to Black as Black clearly could and should have seen the same. *Id.* at 12. Black testified the windshield was not tinted as he had a clear view through the front windshield. Black RTR at 41. Ms. Cooper was looking directly at an officer, later identified as Black based on officer's statements, through the windshield and saw him pointing a gun in her direction and firing. Smith RTR at 25-26. At that point Ms. Cooper, who had been sitting particularly upright, ducked. *Id.* Black testified that it was his intent to stop the car entirely, "my attempt was to get him—*or to keep that car from moving at all*." Black RTR at 10 (emphasis added). Black had no previous

training on shooting into an occupied vehicle, nor was he trained in shooting through a windshield of a car. Black Depo. at 10, 15; Black RTR at 49.[8]

Lt. York believing the car was about to move, shot the left and right rear tires in an attempt to stop the vehicle. York Depo. at 117. York testified he did not want to let the car leave, so he fired at *it*. *Id.* At that point, the suspect yelled at Ms. Cooper to drive, which she did by taking her foot off the brake and slowly moving the vehicle in the hopes that officers would stop firing at them. Cooper Depo. at 69. While at the drive-through window, Ms. Cooper had already been shot in the foot. *Id.* at 66. After his last shots, York began running behind the car warning of innocent passengers in the car, waiving his hand and yelling "Stop firing, stop firing. There are hostages in the car." York Depo. at 134. At that same time, York heard another officer yelling "there were children in the car, cease fire, words to that effect." *Id.*

Officer Lederman, who was positioned to the east of the car on Baymeadows Road, saw the children through the back window which was down, as the car rolled by and began yelling about children being in the car. *See* Deposition of Jason Lederman taken January 24, 2012 ("Lederman Depo.") at 45, 49.[9] Officer Lederman yelled to Officers Black, Griffith, and Santoro, all of whom Officer Lederman saw on the other side of the vehicle. *Id.* at 45. Officer Santoro heard both York and Lederman's cease fire warnings about hostages and children in the vehicle. *See*

---

[8] Despite all of the officers' lack of training regarding shooting into an occupied vehicle and most officers lack of training on shooting into vehicles, officers were trained on how to deal with "inflamed assholes" through firearms. *See* Exhibit 3 of Hackney Depo. Specifically, the training slide purporting to advertise "Preparation H suppository bullets" including a revolver with the following language: "[f]or those days when you have to deal with one inflamed asshole after another." *Id.*

[9] Officer Lederman's deposition was previously filed by Defendant Mike Williams as an exhibit to his Motion for Summary Judgment. *See* (Doc.99-6).

Deposition of Richard Santoro taken May 16, 2012 ("Santoro Depo.") at 6.[10] Likewise, Officer Griffith, who was near Officers Black and Jones heard Officer Jones instruct "Stop firing, stop firing. There's kids in the car." Griffith RTR at 6. *See also* Griffith Depo. at 71. Black does not remember any officers saying anything as the car was moving. Black Depo. at 54. The first time he reports hearing anything from another officer at the scene after the car was identified to him, was after the suspect was handcuffed. *Id.* at 59.

Griffith shot at the vehicle six times, four times while it was moving. Griffith Depo. at 62. The backdrop of Griffith's shots included the large windows of the Wendy's, where it was very likely there were people located. Griffith RTR at 19. As the vehicle started to move, Black reloaded his firearm. Black RTR at 12, 31-32. Black relocated so that he could see "if there was anybody in the car, because that was still a concern of mine," despite already firing through the windshield thirteen times. *Id.* at 14; Smith RTR at 15-16. Black then proceeded to fire eleven more rounds at the moving vehicle. Black RTR at 63. Some more of his rounds were shot through the windshield. Black Depo. at 42. At least five of Black's shots went directly into the side of Ms. Cooper's vehicle, despite Black having no recollection of ever firing those rounds. Black RTR at 72, 73. *See* Plaintiff's Composite Exhibit 5, photographs of bullet holes on side of Cooper's vehicle.[11] In fact, Black initially maintained he only shot through the front windshield. *Id.* at 65. The initial rounds fired by Black were in the direction of Lt. York, who was at that time running behind the car warning of innocent victims in the vehicle. *Id.* at 72-74; York Depo. at 134. Black claims to have not seen York running behind the vehicle and in his backdrop. Black RTR at 72-74. "Where Officer

---

[10] Officer Santoro's deposition was previously filed by Defendant Mike Williams as an exhibit to his Motion for Summary Judgment. *See* (Doc.99-7).

[11] At this point in time, the rear driver's side window was down and light was penetrating the interior of the car such that Jones was able to see the girl in the back seat. Jones RTR at 10.

Black was and Lt. York was, they are basically in a crossfire, potential crossfire situation." *See* Plaintiff's Exhibit 6, Thomas Hackney Deposition taken September 14, 2016 ("Hackney Depo.") at 60. Notably, of all the officers present at the scene only Griffith and Black shot while the vehicle was moving. *Id.* at 75-76.

After the vehicle rolled to a stop the suspect began to exit the vehicle and appeared as if he was going to begin to flee. Santoro Depo. at 45. Officer Lederman shot his firearm as the suspect appeared to get hung up on the vehicle while trying to exit it and began to get back into the vehicle. Lederman Depo. at 55. Officer Lederman fired four shots in quick succession. *Id.* at 59. Despite officers having to obtain firearms qualifications twice a year, once in the first half of the year and again in the second half, Officer Lederman only obtained firearms qualification once in 2009 and 2010. Hackney Depo. at 83-85. Specifically, he qualified in February 2009 and December 2010. *Id.* Thus, he was out of compliance, with regard to firearms recertification, at the time of the events in question. *Id.* Santoro was likewise out of compliance, having qualified in April 2009 and not again until November 2010. *Id.* at 90. Black fired several rounds at the suspect, upon which, the suspect fell to the ground. Black RTR at 75-76. Officer Santoro also fired his weapon at the suspect until he fell to the ground. Santoro Depo. at 46. The suspect was then handcuffed. Black Depo. at 59. As the officers began to remove Ms. Cooper, Officer York yelled to the officers that she was a victim. *See* Plaintiff's Exhibit 7, Transcribed Response to Resistance Board Testimony of Jesse York ("York RTR") at 36. "I don't know if they were aware that she was a carjacked victim or a suspect."[12] *Id.* After voicing that she was a victim, the officers then helped her along. *Id.* The

---

[12] York testified that it appeared as if officers though Ms. Cooper was an accomplice, as Black and Santoro "were in the process of about to place Ms. Cooper down on the ground as if to handcuff." York Depo. at 132.

officer trying to remove Cooper from the car became embarrassed when another officer told him to let her walk. Cooper Depo. at 92.[13]

In total, forty-two rounds were fired during the incident. Smith RTR at 27. The car was struck by 28 shots. *Id.* at 14, *see* Plaintiff's Composite Exhibit 8, photographs of bullet holes and bullet trajectories. Black, alone, fired 24-25 of the rounds. Black Depo. at 74; Smith RTR at 15. York fired his shotgun into the vehicle four times. Smith RTR at 15. Griffith fired six times, while both Lederman and Santoro fired four rounds. *Id.* at 16. In addition, two cars driving down Baymeadows Road during the incident were hit by officer's gunfire. *Id.* at 18. *See* Plaintiff's Exhibit 9, Crime Scene Diagram.

Ms. Cooper was grazed by bullets on her left hand and shoulder. Cooper Depo. at 85. Ms. Cooper was also shot in her right foot. *Id.* at 86. Ms. Cooper had to undergo four surgeries on her foot, followed by rehab. *Id.* at 98. She also had to go to physical therapy for the injuries to her arm. *Id.* at 103-04. Ms. Cooper's young son suffered life-threatening injuries after being shot in his arm and upper chest. *Id. See* Plaintiff's Exhibit 10, photograph of bullet trajectory in backseat. The bullet went through his chest entirely. Cooper Depo. at 87. He was rushed into emergency surgery upon arriving at the hospital. *Id.* at 97. He also suffered a fractured arm. *Id.* at 6. Due to his injuries, he was hospitalized for two weeks. *Id.* He still has scar tissue in his chest, which is visible on x-rays. *Id.* at 106. Additionally, he suffered severe psychological symptomology following the incident. *Id.* at 113-116.

---

[13] When a Jacksonville Sherriff's Officer discharges a firearm the State Attorney's Office comes to the scene to investigate. Hackney Depo. at 33. In addition to a prosecutor, the involved officers' union representative is summoned to assist the officers in responding to the investigation. Griffith Depo. at 81; Lederman Depo. at 74, 76. Notably, an Assistant General Counsel also comes to the scene due to liability that exists and "to protect the City's interest." Hackney Depo. at 34. Officers are instructed to restrict their conversations during these encounters only to information that needs to be put out, in order to avoid being a witness. *See* Exhibit 2 of Hackney Depo.

## II.   Summary Judgment Standard

Under Rule 56(c), Fed.R.Civ.P., summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-movant. *See Mize v. Jefferson City Board of Education*, 93 F.3d 739, 742 (11th Cir. 1996) (quoting *Hairston v. Gainesville Sun Publishing Company*, 9 F.3d 913, 919 (11th Cir. 1993).).

The party seeking summary judgment bears the initial burden of demonstrating to the court by reference to the record, that there are no genuine issues of material fact to be determined at trial. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is genuine issue for trial." *Jeffrey v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995) (citing *Dibrell Brothers International, S.A. v. Banca Nazionale Del Lavoro*, 38 F.3d 1571, 1578 (11th Cir. 1994). *See also Allen v. Bd. of Public Education*, 495 F.3d 1306, 1315 (11th Cir. 2007).

### III.    Unreasonable Seizure – Fourth Amendment Violation

Initially, Defendant Williams contends that Plaintiff and her son were not "seized" for purposes of the Fourth Amendment when they were shot by police officers. *See* Motion at 7-16. However, Plaintiff maintains that the officers were not just shooting at the suspect, but rather the vehicle itself and any occupants who may remain therein.

#### A.    Police Officers Shooting Plaintiff and Her Son Constitutes a "Seizure"

The Fourth Amendment protects "[t]he right of the people to be secure in their persons...against unreasonable...seizures." U.S. Const. Amend. IV. Interpreting the Fourth Amendment in *Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989), the United States Supreme Court held:

> Violation of the Fourth Amendment requires an intentional acquisition of physical control. A seizure occurs even when an unintended person or thing is the subject of a detention or taking, but the detention or taking itself must be willful....
>
> It is clear, in other words, that a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby) nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied.*

(emphasis in original, internal citations omitted). The court further stated:

> In determining whether the means that terminates the freedom of movement is the very means that the government intended *we cannot draw too fine a line,* or we will be driven to saying that one is not seized who has been stopped by accidental discharge of a gun with which he was meant only to be bludgeoned, or by a bullet in the heart that was meant only for the leg. We think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result.

*Id.* at 598-99 (emphasis added).

Thus, an unintended person may be the object of detention, so long as the detention is willful and not merely the consequence of an unknowing act. *Brendlin v. California,* 551 U.S. 249, 254 (2007). For purposes of determining whether a person is "seized" by an officer under the Fourth Amendment, the relevant intent is the intent that has been conveyed to the person confronted. *Id.* at 260-61. Furthermore, when police stop a car, a passenger in the car, like the driver, is seized for Fourth Amendment purposes. *Id.* at 251. Finally, it is clear that "apprehension by use of deadly force is a seizure." *Tennessee v. Garner,* 471 U.S. 1, 7 (1985).

In *Fisher v. City of Memphis,* 234 F.3d 312, 315 (6th Cir. 2001), the Sixth Circuit, applying *Brower,* affirmed the finding of a Fourth Amendment violation under the following facts:

> On March 24, 1996, Officer William Taylor of the Memphis Police Department stopped to speak to two young women. As they spoke in the middle of Speed Street, they noticed a vehicle driven by Demetria Becton ("Becton"), approaching in their direction. To avoid being hit, the two women jumped onto the curb, and the officer jumped onto the hood of his police car, simultaneously firing a gun at the car. *The bullet went through the driver's side window and hit the passenger, Elitia Fisher.*

234 F.3d at 315 (emphasis added). The Sixth Circuit held the intent to stop the vehicle included the intent to seize everyone inside:

> Here, Becton's car was the intended target of Defendant's intentionally applied exertion of force. By shooting at the driver of the moving car, he intended to stop the car, effectively seizing everyone inside, including Plaintiff. Thus, because the Defendant "seized" the Plaintiff by shooting at the car, the district court did not err in analyzing the Defendant's actions under the Fourth Amendment.

*Id.* at 318-19.

In *Vaughan v. Cox,* 343 F.3d 1323 (11th Cir. 2003), the Eleventh Circuit resolved the question of whether a passenger in a car is seized when struck by a bullet intended for the driver or to stop the vehicle. In firing his gun into the car, the officer intended "to disable either the truck

12

or [the driver] so that he could force the truck off the road." *Id.* at 1327. However, in firing into the truck, the officer struck the passenger in the spine, paralyzing him. *Id.* The district court granted summary judgment to the officer, on the basis that the passenger was not "seized" for the purposes of the Fourth Amendment and, in any event, the use of deadly force was reasonable under the circumstances. *Id.* The Eleventh Circuit reversed, finding that the passenger was subjected to a Fourth Amendment seizure. *Id.* at 1329.[14]

Ms. Cooper and her son were seized when she was shot by the police officers firing into the vehicle. Lt. York fired his shotgun not only at Mathis, but two additional rounds into the rear tires of the car to disable the vehicle. York Depo. at 117. When Black began firing into the windshield of the vehicle, Ms. Cooper was sitting upright and was staring right at him. Officer Jones, who was positioned immediately adjacent to Black, stated he had a clear view through the windshield and could clearly see Ms. Cooper and her daughter seated inside. Jones RTR at 6, 12. When asked why he did not advise Black of the hostage's presence in the car, Jones responded that he believed Black "saw what I saw." *Id.* at 12.

Furthermore, the circumstances surrounding the shooting support a reasonable inference Black knew he was shooting into a vehicle occupied with innocent civilians. The shooting occurred during an active carjacking at a fast food establishment at approximately 3:30 in the afternoon. *Ipso facto*, there must have been a victim driver from whom control of the vehicle was obtained. Yet, without seeing an apparent victim outside of the car, Black inexplicably believed that the victim had been removed from it. Alternatively, given the placement of the shots through the car,

---

[14] The court did note, however, a significant distinguishing feature from the facts of this case, *to wit*: the passenger was not a hostage or innocent bystander, but rather, a suspect that the officer wanted to apprehend. *Vaughan*, 343 F.3d at 1328 n. 4. Nevertheless, the court found that the passenger was seized despite the fact the officer did not intend to shoot him.

13

a jury could reasonably infer that the officers believed the car was being used as a getaway car and the officers were trying to shoot every occupant of it and/or disable it.[15] More fundamentally, however, Black's own testimony creates a genuine issue of material fact as to whether he was shooting at Mathis or indiscriminately into the vehicle: "my attempt was to get him – *or to keep that car from moving at all.* My first volley of shots was on a stationary car." Black RTR at 10 (emphasis added). Accordingly, genuine issues of material fact exist as to whether Plaintiff and her son were "seized."

In arguing no Fourth Amendment "seizure" occurred, Sheriff Williams primarily relies upon *Troupe v. Sarasota County,* 419 F.3d 1160 (11th Cir. 2005),[16] as well as cases from other circuits which hold that innocent bystanders or hostages are not seized for Fourth Amendment purposes when police accidentally hit them while aiming for a suspect. *See* Motion at 7-9, 14-17. For the reasons set forth below, *Troupe* is distinguishable from the instant case, and the authorities from other circuits are inapplicable, as they, like the Eleventh Circuit's decision in *Troupe,* were all decided before the Supreme Court's 2007 decision in *Brendlin.*

To begin, *Troupe* is distinguishable from the instant case. In *Troupe,* members of the Sarasota County SWAT Team responded to the residence of an individual named Hart to serve a warrant for Hart's arrest. 419 F.3d at 1163. When the SWAT team arrived, Hart and two other males, Robinson and Waiters, entered a car parked in the driveway. *Id.* at 1164. The men locked the doors and refused to let the police in the car despite commands to do so. *Id.* Hart was the driver and attempted to flee almost running over officers in the process. *Id.* One of the officers, Bauer,

---

[15] Such an inference can also be reached based upon York's testimony that it appeared Black and Santoro were attempting to handcuff Ms. Cooper.

[16] To the extent *Vaughan* and *Troupe* conflict with one another, this Court should treat *Vaughan* as controlling under the "earliest case" rule of the Eleventh Circuit. *Walker v. Mortham,* 158 F.3d 1177, 1188 (11th Cir. 1998).

saw the car coming directly at him. Bauer aimed his weapon, fired two shots at the driver (Hart), and jumped out of the way of the car as it drove past him. *Id.* One bullet struck the driver's door just above the keyhole and the other went through the driver's side window and hit Hart in the back. *Id.* Prior to Bauer's shots, another officer, Gooding, fired once at the tires, but missed. Importantly, "none of the shots hit either Robinson or Waiters." *Id.* at n.2. Hart then accelerated the car out of the yard and headed west for over three-tenths of a mile. *Id.* He wove through traffic, and to avoid oncoming traffic, went onto the grass and sidewalk, crashing into a concrete wall. *Id.* at 1164-65. Robinson, the front seat passenger, was pronounced dead at the scene, and Waiters, the backseat passenger also suffered serious injuries. *Id.* at 1165.

Robinson's estate and Waiters brought a §1983 action against Sarasota County and the officers involved alleging a Fourth Amendment excessive force claim and the district court granted summary judgment for the defendants. *Id.* at 1163. On appeal from the district court, the Eleventh Circuit held that the defendants were entitled to summary judgment on the plaintiffs' Fourth Amendment claims. First, the court found that the officers' shots were not the proximate cause of injuries to the plaintiff passengers. Rather, the driver's decision to continue his flight and his continued exercise of control over the car after he was shot "was the intervening cause" of the passengers' injuries. *Id.* at 1166. In other words, the driver's reckless driving caused the death and injury to the plaintiffs, not the officers' decision to use deadly force. *Id.*

Second, the court also found there was no Fourth Amendment seizure of the passengers. *Id.* at 1166-67. In reaching this holding, the court stated as follows:

> Furthermore, Gooding's attempt to seize Hart by firing at the tire of the Oldsmobile was not a seizure. "[N]either usage nor common-law tradition makes an *attempted* seizure a seizure." *California v. Hodari,* D., 499 U.S. 621, 626, n.2, 111 S.Ct. 1547, 1551, n.2, 113 L.Ed.2d 690 (1991) (emphasis in original). Additionally, stopping a vehicle's driver does not constitute a seizure of a passenger. *See*

> *County of Sacramento v. Lewis,* 523 U.S. 833, 844, 118 S.Ct. 1708, 1715, 140 L.Ed.2d 1043 (1998), *citing Brower,* 489 U.S. at 596-97, 109 S.Ct. 1378. Thus, when Bauer shot Hart that did not constitute seizure of the passengers. Therefore, the district court erred when it found Gooding and Bauer seized the occupants of the vehicle.

*Id.* at 1167.

In light of the discussion about *Troupe, supra,* it is clear that *Troupe* is distinguishable from the instant case. Unlike in *Troupe,* Ms. Cooper and her son were hit by the shots aimed at the car. In *Troupe,* neither passenger was struck by the shots. Moreover, it is the actions of the police officers in the instant case (gunshots) which were the proximate cause of Plaintiffs' injuries, unlike in *Troupe,* where the injuries resulted from the reckless driving of the person driving the vehicle. Furthermore, the gunfire from the police officers caused Plaintiff's vehicle to come to a stop. In contrast, "the gunfire in *Troupe* did not cause the vehicle to stop, and there was thus no seizure." *Rodriguez v. Passinault,* 637 F.3d 675, 686 (6th Cir. 2011).

In addition to being factually distinguishable, the legal underpinnings of the holding regarding the Fourth Amendment claim in *Troupe* are no longer valid in light of *Brendlin,*[17] which was decided subsequent to *Troupe.* In *Brendlin,* contrary to the Eleventh Circuit's holding in *Troupe,* the Supreme Court held that when a driver of a car is seized, the passenger is also seized for Fourth Amendment purposes. 551 U.S. at 250, 258-59. Moreover, the court's statement in

---

[17] The Sheriff contends that the Eleventh Circuit has already foreclosed Plaintiff's argument that she and her son were "seized" under the Fourth Amendment in finding Black was entitled to qualified immunity. *See* Motion at 17 n. 10. Such argument overstates the finding by the court. The court clearly based its decision on the clearly established law prong of its qualified immunity analysis: "our analysis begins and ends with the clearly established prong." *Cooper v. Rutherford,* 503 Fed.Appx. 672, 674 (11th Cir. 2012). The court did not decide whether the conduct amounted to a constitutional violation. *See id.* at 677 ("Again, assuming without deciding that Officer Black violated Appellee's constitutional rights....") Of course, a municipality, like the Sheriff's Office here, cannot avail itself of the defense of qualified immunity. *See Owen v. City of Independence,* 445 U.S. 622, 650-51 (1980).

*Troupe* that stopping a vehicle's driver does not constitute a seizure of the passenger, 419 F.3d at

1167, which cites to *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708 (1998), "was

made without any analysis and the cited case, *County of Sacramento,* does not so hold." *Rodriguez,*

637 F.3d at 686. Accordingly, *Troupe* is factually distinguishable and the legal underpinnings of

the case are no longer valid in light of the Supreme Court's later decision in *Brendlin,* to the extent

said assertion was even valid to begin with.

Sheriff Williams also relies on cases from other circuits which hold that hostages and

innocent bystanders which are accidentally shot by bullets intended for a suspect do not state a

Fourth Amendment claim. *See* Motion at 14-17. All of these cases, like *Troupe,* however, were

decided prior to *Brendlin* and are thus inapplicable to the instant case. Many of these cases are

distinguishable for other reasons as well. For example, in *Medeiros v. O'Connell,* 150 F.3d 164

(2d Cir. 1998), contrary to the instant case, it was undisputed that the officer who fired the shots

that hit the hostage in the vehicle was firing at the suspect. *Id.* at 167. Also, unlike the instant case,

the vehicle in which the suspect and "hostages" were present, was at a complete stop and

"pin[ned]" against a "guard rail" when the officer fired his shots. *Id.* Thus, unlike the instant case,

the shots were not fired to stop the vehicle.

Additionally, in *Rucker v. Hartford County,* 946 F.2d 278 (4th Cir. 1991), the "bystander"

who was shot by a bullet aimed for the suspect's vehicle was not a passenger in the vehicle like

Ms. Cooper and her son were in the instant case. *Id.* at 280.  It was also "undisputed" that the

plaintiff (Rucker) "was not the intended object of the shooting." *Id.* at 281. Likewise, in *Schaefer

v. Goch,* 153 F.3d 793 (7th Cir. 1998), the shots were clearly intended for the hostage taker, *id.* at

795, and unlike the instant case, the shooting did not involve shots fired at a vehicle. Therefore,

the cases relied upon by Sherriff Williams are distinguishable and inapplicable to the facts of this case.

**B.      The Officer's Seizure of Ms. Cooper and Her Son was Unreasonable**

Whether a use of force is reasonable, requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. *Graham v. Connor*, 490 U.S. 386, 396 (1989). "In determining the reasonableness of the force applied, the court should analyze the facts from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009) (citing *Scott v. Harris*, 550 U.S. 372 (2007)).

> The 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officer's actions 'objectively reasonable' in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation. It must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.

*Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004) (citations omitted). By necessity, the determination of whether an officer's conduct is objectively unreasonable is a fact-intensive inquiry and the court must "slosh [its] way through the fact bound morass of 'reasonableness.'" *See Scott*, 550 U.S. at 383. *See also Hart v. Logan*, 664 Fed. Appx. 857, 862 (11th Cir. 2016); *Long v. Slayton*, 508 F.3d 576, 580 (11th Cir. 2007).

Although the Supreme Court has not annunciated the factors taken into account when there is a high likelihood of injury to innocent civilians when using deadly force to apprehend a suspect, the court should consider "not only the number of lives at risk, but also their relative culpability." *Scott*, 550 U.S. at 384. Analysis of the facts, taken in a light most favorable to the Plaintiff, results

in the determination that the officer's use of deadly force in the instant case was objectively unreasonable.

The actions of the officers were objectively unreasonable based on the attendant circumstances. Police officers responded to a Wendy's following a bank robbery. As officers arrived, they observed the suspect carjacking a car full of innocent civilians. Despite Officer York seeing the suspect with a gun, Officers Black and Griffith did not, yet began firing into the car. Officer Black, the officer responsible for firing 24 shots, was standing directly next to Officer Jones, who saw two hostages in the car. Officer Jones testified he did not warn Officer Black because he was standing next to him and should have seen the other occupants in the car. The officers' backdrop during the encounter was the windowed dining area of the Wendy's restaurant, which contained additional innocent civilians. Additionally, Officer Black and Griffith created a crossfire situation, shooting their guns towards Officers York and Lederman, who were trying to warn other officers not to shoot as there were hostages in the car. Two vehicles driving on a Baymeadows Road were also hit with bullets.

The Sherriff maintains that the officers only intended to shoot the suspect, however, their intent is irrelevant in determining "objective" reasonableness. It was objectively unreasonable to shoot in this situation, where there were numerous innocent civilians who could have been and were injured. It would be entirely appropriate for a jury to discredit the officers' testimony they were only shooting at the suspect given the physical evidence and circumstances surrounding the shooting.[18] The evidence shows that Black and Griffith were indiscriminately shooting while innocent citizens were being harmed.

---

[18] York's testimony that Santoro and Black were attempting to handcuff Ms. Cooper also belies Black's testimony that he was only shooting at the driver.

Furthermore, as there were multiple other officers present that did not shoot at the vehicle, either stationary or moving, there exist genuine issues of material fact as to whether the use of deadly force was unreasonable. Officer Jones, who was standing next to Black, testified he did not shoot into the car because his backdrop was the Wendy's. Jones RTR at 18. Additionally, he clearly saw the carjacking victim and did not ever see her exit the vehicle so he knew that it contained innocent civilians. Jones RTR at 21. Officer Santoro and Lederman also waited to fire until the suspect exited the vehicle to avoid injuring any innocent civilians. Former Jacksonville Sheriff John H. Rutherford summed up his beliefs on Black and Griffiths' shooting: "[u]sing the standard of a reasonable officer under the same circumstances, one would have to expect that the use of deadly force should not have been applied." *See* Hackney Depo. at Exhibit 11. Further, "[r]easonableness dictates that if officers did not know if there were occupants in the car other than the suspect, or others in their backstop area, they should not have been shooting at the car." *Id.*

## IV.    Substantive Due Process Violation

In order to establish a claim for a substantive due process violation under the Fourteenth Amendment, a government official's actions must "shock the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). *See also White v. Lemacks*, 183 F.3d 1253, 1258 (11th Cir. 1999). While negligently inflicted harm will not satisfy the Plaintiff's burden:

> actions "intended to injure in some way unjustifiably by any government interest" are those "most likely to rise to the conscience-shocking level." Acts that fall between the poles of negligence and malign intent require courts to make "closer calls," in which the determination of what shocks the conscience is context-specific.

*Nix v. Franklin County Sch. Dist.*, 311 F.3d 1373, 1375-76 (11th Cir. 2002) (internal citations omitted).

The officers' conduct in deliberately shooting into a vehicle 42 times, with knowledge of the presence of Ms. Cooper and her minor children in the vehicle, is conscience-shocking.[19]

## V.    Municipal Liability

Local governments may be sued pursuant to § 1983 if "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Department of Social Servs.*, 436 U.S. 658, 690 (1978). Additionally, local governments "may be sued for unconstitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels." *Id.* at 690-91. Thus, "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts...injury...the government as an entity is responsible under § 1983." *Id.* at 694[20].

"[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the right of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388, (1989). To find deliberate indifference, a city must know of a need to train in a particular area. *See Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1293 (11th Cir. 2009). In the Eleventh Circuit, such notice can be established in two ways: first, a pattern of constitutional violations exists of which the City is aware; or, second, in the absence of prior incidents, the likelihood for constitutional violation is so

---

[19] This Court has previously found the allegations set forth in the Complaint stated a claim for a Fourteenth Amendment substantive due process violation as the officers' "purposeful and deliberate actions shock this Court's conscience." *See* Order at 9 (Doc. 36) As set forth above, the record evidence supports the allegations of the Complaint.

[20] Furthermore, "*Monell, supra*, and its progeny do not require that a jury must first find an individual defendant liable before imposing liability on a local government." *Anderson v. City of Atlanta*, 778 F.2d 678, 686 (11th Cir. 1985).

high that the need for training would be obvious. *Id.* The use of deadly force is one such area: "the need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *Canton*, 489 U.S. at 390 n. 10 (citation omitted).

> The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice – namely, a violation of a specific constitutional or statutory right. The high degree of predictability may also support an inference of causation – that the municipality's indifference led directly to the very consequence that was so predictable.

*Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 409-10 (1997). Thus, "a single constitutional violation may result in municipal liability when there is 'sufficient independent proof that the moving force of the violation was a municipal policy or custom.'" *Vineyard v. County of Murray*, 990 F.2d 1207, 1212 (11th Cir. 1993) (quoting *Gilmere v. City of Atlanta*, 774 F.2d 1495, 1504 n. 10 (11th Cir. 1985)).

By failing to provide a policy to its officers with regard to discharge of firearms when hostages are present, particularly when shooting into a vehicle, JSO was deliberately indifferent to the lives of citizens that come into contact with its officers. JSO had a policy that provided generally for its officers not to discharge weapons into *moving* vehicles, except as a last resort: 1) when all other opportunities have been exhausted, to prevent death or great bodily harm to the officer or another person; or 2) to prevent the escape of a fleeing felon who would pose an imminent threat of death or great bodily harm. Response to Resistance Order at 48. This no doubt was promulgated due to the obvious harm that would be suffered by unwitting public upon shooting the driver of a moving automobile. However, JSO's deadly force policy fails to provide

22

any direction to its officers for hostage situations, merely advising: "officers must exercise reasonable caution in order to avoid unnecessarily endangering the lives of bystanders. When possible, officers should give consideration to the backdrop, bystanders, and location." *Id.* at 49. Director Hackney acknowledged JSO's policy's failure to address discharge of firearms in hostage situations. Hackney Depo. at 12.

Despite the written policy, JSO provided no training to its officers regarding it. The officers testified that none of their training involved shooting into a vehicle, with the exception of Black, who testified that he once received training about shooting into a stationary vehicle, but none regarding the presence of hostages, bystanders or others in such situations. Griffith testified he could not recall receiving any training regarding hostage or bystander scenarios, although he had received it during his stint as a Detroit police officer. Griffith Depo. at 23-25. Although York thought JSO's policy prohibited shooting into occupied vehicles, upon review of the policy he acknowledged it only applied to a moving vehicle. York Depo. at 51, 54. Furthermore, although York received training regarding firearms and vehicles, the training "basically demonstrated to the student that you could safely shoot from the confines of a vehicle and still accurately hit your target." *Id.* at 153. "It was more of an officer safety type thing," and did not address shooting situations with hostages and bystanders. *Id.* Lederman, who is a firearms instructor with JSO, had never received training on shooting into occupied vehicles, apart from being provided the Response to Resistance Order. Lederman Depo. at 19-20. None of Lederman's training regarding hostage negotiations involved a shooting scenario, *id.* at 98, and Director Hackney confirmed JSO's operational order regarding hostages does not address discharge of firearms. Hackney Depo. at 38. Santoro testified he had never been trained regarding shooting into vehicles, where hostages and/or innocent civilians were present. Santoro Depo. at 104. Black testified he received training

via a simulator that contained a hostage scenario. Black Depo. at 10-11. However, when confronted with a suspect who was entering a vehicle, Black discharged a full magazine into the car, reloaded and fired off eleven more rounds into it, with no regard to the hostages or any innocent civilians who would be endangered by his conduct.

Furthermore, there exists other evidence of JSO's systemic failure to adhere to its stated policy regarding deadly force which would render it liable. Despite the training advising of a prohibition using shotguns, two officers present retrieved shotguns, with one of the officers firing four rounds. Despite JSO's policy regarding officers to obtain firearms re-qualification twice a year, two of the officers firing their weapons were out of compliance with such requirement. Furthermore, despite JSO allegedly having in place an early warning system to detect a potentially problem officer, Director Hackney could not state whether such system flagged Officer Black who had ten (10) reported internal affairs incidents between March 28, 2006 and July 3, 2009. Hackney Depo. at 108.

The need to train its officers in the use of deadly force in hostage situations is "so obvious" as the potential for killing innocent civilians is high. JSO's policy wholly ignores such situations and its failure to train regarding it was the "moving force" causing the injuries to Ms. Cooper and her son. Accordingly, genuine issues of material fact exist which preclude the entry of summary judgment for Sheriff Williams. *See Edenfield v. Est. of Willets*, 2006 WL1041724, *18 (D. Haw. 2006).

## VI.   State Law Claims

### A.   Battery

A claim for battery consists of the infliction of a harmful or offensive contact upon another with the intent to cause such contact or the apprehension that such contact is imminent. *Paul v.*

*Holbrook*, 696 So.2d 1311, 1312 (Fla. 5th DCA 1997). "The intent may be established if the plaintiff demonstrates the tortfeasor acted with reckless disregard of the consequences of his acts." *Chorak v. Naughton*, 409 So.2d 35, 39 (Fla. 2nd DCA 1981). Where a sheriff has given his officers the authority to use force and the officers abuse such authority, as opposed to usurping such authority, the sheriff is liable for the officers' conduct. *See McGhee v. Volusia County*, 679 So.2d 729 (Fla. 1996). In this case, there can be no question that being struck by the bullet constitutes harmful or offensive contact. Furthermore, based upon the facts taken in the light most favorable to Plaintiff, there exists a genuine issue of material fact as to whether the officers acted with reckless disregard of the consequences of their acts.

Sheriff Williams seeks to excuse the officers conduct on the basis that it was reasonable, and therefore justified, pursuant to § 776.05(1), Fla. Stat. *See* Motion at 27. For the reasons stated above, there exists genuine issues of material facts as to whether the officers' discharge of firearms was reasonable under the circumstances. *See Ansley v. Heinrich*, 925 F.2d 1339, 1343 (11th Cir. 1991) ("whether the officers' use of force was reasonably necessary [under § 776.05] is an issue of fact for the jury to determine"); *Hernandez v. State*, 842 So.2d 1049, 1051 (Fla. 4th DCA 2003) ("whether a person was justified in using deadly force [under § 776.012, Fla Stat.] is a question of fact for the jury to decide if the facts are disputed").

### B.    Negligence

Sheriff Williams seeks judgment as a matter of law on Plaintiff's negligence claim on the basis that there is no cause of action for a negligent use of excessive force. *See* Motion at 28-29. However, Sheriff Williams cannot have it both ways; on one hand, he argues that because the officers did not fire at the Plaintiff or her children, there can be no battery claim, *id.* at 28, however, on the other hand, he contends that "the sole civil cause of action under Florida law for a claim

that police used excessive force is battery." *Id.* at 29. Sherriff Williams has a fundamental misunderstanding of the alternative theories of liability asserted by Plaintiff.

"Florida law… clearly recognizes a cause of action for the negligent handling of a firearm and the negligent decision to use a firearm separate and distinct from an excessive force claim." *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1263 (11th Cir. 2001). *See also Mazzilli v. Doud*, 485 So.2d 477 (Fla. 3rd DCA 1986) (upholding negligence claims arising from law enforcement failures to exercise reasonable care in discharging firearms at an undercover agent where the officer testified that he did not know who was present at the scene, but believed someone was committing a felony); *Vogel v. City of Miami*, 2007WL3355404 (S.D. Fla. 2007) (finding plaintiffs' "negligence claim is premised not upon actions that necessarily must be pleaded as an intentional tort, but on a decision-making process that could potentially have been carried out in a negligent manner"). Somewhat remarkably, Sheriff Williams further contends that "there are no facts in the record to support … that the officers 'placed plaintiff's into and/or created a foreseeable zone of risk.'" Motion at 29. Clearly, firing forty-two (42) rounds at the vehicle, in which Plaintiff and her children were seated, with twenty-eight (28) shots striking the vehicle, created a "foreseeable zone of risk."

However, in the event the Court grants summary judgment to Sheriff Williams on the constitutional claim, this Court should retain its jurisdiction to try the case, although the Court does have discretion to decline exercise jurisdiction over the supplemental State law claims pursuant to 28 U. S. C. § 1367 (c)(3). "If the Federal claims are dismissed prior to trial, *Gibbs* strongly encourages or even requires dismissal of the State claims." *Faucher v. Rodziewicz*, 891 F.2d 864, 871 (11th Cir. 1990) (citing *United Mineworkers V. Gibbs*, 383 U.S. 715, 726 (1966)).

Respectfully submitted,

Wm. J. Sheppard, Esquire
Florida Bar No.: 109154
Elizabeth L. White, Esquire
Florida Bar No.: 314560
Matthew R. Kachergus, Esquire
Florida Bar No.: 503282
Bryan E. DeMaggio, Esquire
Florida Bar No.: 055712
Jesse B. Wilkison, Esquire
Florida Bar No.: 118505
Camille E. Sheppard, Esquire
Florida Bar No.: 124518
Sheppard, White, Kachergus & DeMaggio, P.A.
215 Washington Street
Jacksonville, Florida 32202
Telephone:    (904) 356-9661
Facsimile:    (904) 356-9667
Email:        sheplaw@att.net
COUNSEL FOR PLAINTIFF

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing has been furnished to the following by Electronic Mail, this _15th_ day of August, 2017.

**Stephen J. Powell, Esquire**
**Chief, Tort-Employment Litigation**
**Office of General Counsel**
**117 West Duval Street**
**Suite 480**
**Jacksonville, Florida 32202**

ATTORNEY

jlp[cooper.joann.response.msj]