UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

JOANN COOPER, individually,
and as next friend of D.C.,

        Plaintiff,

v.                                   Case No. 3:10-cv-695-J-20PDB

MIKE WILLIAMS, in his official
capacity as Sheriff of the Consolidated
City of Jacksonville and Duval County,
Florida, et al.,

        Defendant.
_____/

## O R D E R

This matter is before this Court on "Defendant Sheriff Williams' Motion for Summary Judgment and Supporting Memorandum of Law" (Dkt. 97), Plaintiffs' response (Dkt. 109), "Defendant City's Reply to Plaintiff's Response to City's Motion for Summary Judgment" (Dkt. 117), and the parties "Joint Motion for Extension of Time to File Pre-Trial Stipulation and Motions in Limine" (Dkt. 121).

**Facts**

On Friday, March 26, 2010, shortly after 3:00 p.m., Jacksonville Sheriff's Office ("JSO") officers responded to an armed bank robbery in progress at the Wachovia Bank, 8715 Baymeadows Road. The bank robbery suspect, later identified as Jeremiah Mathis, fled the business on foot and was located behind nearby businesses by one of the responding officers. Mathis refused repeated commands to stop and fled toward a nearby Wendy's restaurant.

Joann Cooper and her minor children, A.C. (daughter) and D.C. (son), were in Cooper's vehicle at the drive-through window of the Wendy's restaurant facing Baymeadows Road. The

children were in the back seat, with D.C. sitting directly behind Cooper. All four windows of Cooper's vehicle were tinted. There were no cars in front of Cooper.

While at the window of the drive-through lane, Cooper saw a male, later identified as Mathis, approach the front fender of her car. Mathis came to Cooper's door and ordered her out of the vehicle, which she initially refused to do. Cooper offered for Mathis to take the vehicle, but told him she would first need to remove her children. Mathis then raised his firearm and told her he was going to kill her.

From a position behind Cooper's car, Lt. York observed Mathis trying to force his way into the vehicle and shouted at him to stop. At that point, York heard Cooper screaming and heard Mathis say: "I will shoot you" and "I will kill you," referring to Cooper. As Mathis attempted to get into Cooper's vehicle, York fired his shotgun at Mathis as he stood (with his back to York) in the swing of the open driver's door. The shotgun pellets struck and shredded the inside of the driver's door. York again commanded the armed carjacker to stop and show his hands. When Mathis did not comply, York fired a second round at him. Mathis then fully entered the vehicle. Meanwhile, inside the car, Cooper fought with Mathis and knocked his gun away from him onto the floorboard of the passenger's seat. At which time, York fired an additional round at each of the car's rear tires in an attempt to deflate the tires and limit the mobility of the vehicle.

After York fired at the rear tires, Cooper's vehicle began to move forward. York heard other gunfire and became aware that another police officer, R.C. Santoro, approached York's position from behind him. Aware that Cooper was in the car, York "yelled at the top of his lungs, trailing behind the car, waving [his] shotgun" for everyone to stop firing. At nearly the same

2

time, Officer Lederman, who was positioned to the front and left of the Cooper's vehicle as it moved forward toward Baymeadows Road, yelled "stop firing, there's a kid in the car" or words to that effect.

After York's initial shots, Cooper heard more shots and saw police officers in front of her. The windshield started shattering and Cooper leaned over to the right, put her head in the passenger seat, and "covered" herself. At this point, Cooper could not see out the windshield. Also at this time, the Mathis pushed his way into the car and sat on Cooper's left thigh/hip. After Mathis was in the car and sitting on her, and as her head was on the right front passenger seat, Cooper was struck by a bullet in her right foot. At some point during the incident, D.C. was also wounded in his left arm and chest.

Mathis yelled "drive, drive," so Cooper took her right foot off the brake and put her foot "on the gas slightly and the car rolled out." Cooper heard no shouting until her car came to a stop on the far (south) side of Baymeadows and officers came up to the vehicle. The entire time that her vehicle was moving, Cooper was leaned over in the right front passenger seat.

While Cooper's vehicle was stationary at the Wendy's pick-up window and as it rolled forward toward Baymeadows Road, it was struck by a total of 26 shots fired by JSO officers (not including the four shotgun rounds fired by Lt. York from behind the vehicle).[1] As best as can be determined, four of the bullets that struck or entered the vehicle were fired by Police Recruit D. Griffith from approximately a 90-degree position to the right of Cooper's vehicle. With the

---

[1] Cooper suggests that her vehicle was impacted by 28 bullet strikes. The City explains this apparent discrepancy by pointing to the Bullet Strike diagram (Dkt. 99-32) that lists 28 bullet strikes, but identifies BS6 and BS7 are "secondary strikes" (to BS1 and BS2, respectively). Therefore, the total of shots fired that struck Cooper's vehicle (not including York's shotgun rounds fired at Mathis and the rear tires) is 26.

3

exception of one of the bullet strikes, the rest of the shots fired at Mathis that struck the vehicle were fired by Officer R. Black (from in front of and from the right side of Cooper's vehicle).

After the vehicle came to a stop after crossing Baymeadows, York observed Mathis exit the vehicle and heard gunfire. As Mathis exited the car, he was shot by the police, including Officers Lederman, Santoro and Black, after ignoring commands to stop.

York observed Cooper being taken out of the car by two officers. As it appeared to York that officers might be about to handcuff Cooper, York yelled out that she was a victim and Cooper was escorted to a grassy area where she was seated until rescue arrived. Thereafter, the back doors opened and York first became aware that there were two children in the backseat of the car.

Cooper was grazed by bullets on her left hand and shoulder. Cooper was also shot in her right foot. Cooper had to undergo four surgeries on her foot, followed by rehabilitation. She also had to go to physical therapy for the injuries to her arm. Cooper's minor son, D.C., suffered life-threatening injuries after being shot in his arm and upper chest. He was rushed into emergency surgery upon arriving at the hospital. D.C. also suffered a fractured arm. Due to his injuries, D.C. was hospitalized for two weeks. Additionally, D.C. suffered severe psychological symptomology following the incident. While the injuries to Cooper and D.C. were serious (and life-threatening as to D.C.), the only person killed as a result of the incident was the armed robber/carjacker, Mathis.

**Procedural History**

The initial Complaint was filed on August 10, 2010. (Dkt. 1). Following a motion to dismiss, this Court determined that all the officers involved, with the exception of Black, were

protected by qualified immunity and should be dismissed from this action. (Dkt. 36). Black filed an interlocutory appeal of the denial of his request for qualified immunity. The Eleventh Circuit reversed and directed that Black too be granted qualified immunity and dismissed from this case. (Dkt. 52).

Thereafter, on November 26, 2013, the Amended Complaint was filed. (Dkt. 67). Counts I and II, of the Amended Complaint, maintain that the City violated Cooper's rights under the Fourth and Fourteenth Amendments to the United States Constitution through the actions of its officers and the Sheriff, and she seeks damages against the City under 42 U.S.C. § 1983. In Counts III and IV, Plaintiff seeks to hold the City liable for damages under Florida law for battery and negligence.

**Standard**

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where the nonmoving party bears the burden of proof at trial, the moving party may discharge this 'initial responsibility' by showing that there is an absence of evidence to support the nonmoving party's case or by showing that the nonmoving party will be unable to prove its case at trial." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). If the moving party does so, the nonmoving party "must come forward with evidence sufficient to withstand a directed verdict motion." *Id.*

In other words, the entry of summary judgment is appropriate "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the

5

burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In making this determination, a court "'must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'" *Hinson v. Clinch Cty., Ga. Bd. of Educ.*, 231 F.3d 821, 826-27 (11th Cir. 2000) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). "'[T]he court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* at 827 (quoting *Reeves*, 530 U.S. at 151). "In other words, [the court] must consider the entire record, but 'disregard all evidence favorable to the moving party that the jury is not required to believe.'" *Id.* (quoting *Reeves*, 530 U.S. at 151).

However, the nonmoving party "may not rest upon the mere allegations or denials in its pleadings. Rather, its responses . . . must set forth specific facts showing there is a genuine issue for trial. A mere 'scintilla' of evidence supporting the opposing party's position will not suffice." *Walker v. Darby*, 911 F.2d 1573, 1576-77 (11th Cir. 1990).

**Discussion**

The facts of this litigation are sobering and heroic. Cooper was placed in a life-threatening situation through no fault of her own, yet she responded with audacity, courage and determination. The officers who responded to this chaotic scene were confronted with an armed suspect which required split-second decision-making. It was a minor miracle that the aggressor—Mathis—was the only one who perished on March 26, 2010.

This lawsuit that springs from that scene, however, places this Court in the unenviable and sobering position of explaining that the United States Constitution does not provide a remedy

6

for every tragedy, nor is it implicated every time a law enforcement officer injures an innocent bystander.

**Count I**

The City insists it is entitled to summary judgment on Count I because Cooper's claims cannot form the basis of a Fourth Amendment violation. Cooper retorts the City relies on case law that was decided prior to the Supreme Court's more recent clarification, in *Brendlin v. California*, 551 U.S. 249 (2007), that once the driver of a vehicle is seized, the passenger too is seized for purposes of the Fourth Amendment.

"Section 1983 of Title 42, United States Code, creates a private right of action to remedy violations of 'rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016) (quoting *Rehberg v. Paulk*, 566 U.S. 356, 361 (2012)). "To establish a claim under § 1983, a plaintiff must demonstrate that a person acting under color of state law deprived him of a federal right." *Id.*

The Fourth Amendment "covers only 'searches and seizures.'" *County of Sacramento v. Lewis*, 523 U.S. 833 (1998). For obvious reasons, determining what conduct fits within the boundaries of a Fourth Amendment "search and seizure" is a difficult and fact intensive inquiry. However, for purposes of this litigation, the Supreme Court has explained "that a police pursuit in attempting to seize a person does not amount to a 'seizure' within the meaning of the Fourth Amendment." *Id.* at 844. Nor is the Fourth Amendment implicated,

> whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only when there is a

7

governmental termination of freedom of movement *through means intentionally applied.*

*Id.* at 844 (emphasis in original, internal quotations omitted).

In other words, "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement, *through means intentionally applied.*" *Brendlin v. California*, 551 U.S. 249, 254 (2007) (internal citations and quotations omitted, emphasis in original). Thus, an "unintended person . . . [may be] the object of the detention," so long as the detention is "willful" and not merely the consequence of "an unknowing act." *Id.*

The Eleventh Circuit has recognized that the Fourth Amendment is only implicated by intervention "'directed at a specific individual.'" *Troupe v. Sarasota Cty.*, 419 F.3d 1160, 1167 (11th Cir. 2005) *cert. denied*, 547 U.S. 1112 (2006) (quoting *Landol-Rivera v. Cruz Cosme,* 906 F.2d 791, 796 (1st Cir.1990)). "Force regardless of the form directed to a driver of a vehicle—particularly one attempting to flee—does not give rise to a due process deprivation claim unless it was exercised with a purpose to cause harm unrelated to the legitimate object of arrest." *Id.* (internal quotations removed).

Nevertheless, the Supreme Court has made two points clear. First, "there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirements of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, at 7 (1985). Second, "the Fourth Amendment addresses misuse of power, not the accidental effects of otherwise

8

lawful government conduct." *Brower v. Cty. of Inyo*, 489 U.S. 593, 596 (1989) (internal citation and quotations removed).

However, the issue of whether a Fourth Amendment seizure occurred has already been resolved by the Eleventh Circuit in this case. In addressing Black's interlocutory appeal, the Court addressed Cooper's argument that Black's conduct implicated the Fourth Amendment. The Court rejected this argument. Specifically, the Court explained,

> Regarding the Fourth Amendment unreasonable seizure claim, Appellees point to two cases, *Brendlin v. California*, 551 U.S. 249, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007) and *Vaughan v. Cox*, 343 F.3d 1323 (11th Cir. 2003), that they believe clearly establish that the events on March 26, 2010, amount to a seizure for the purposes of the Fourth Amendment. However, the facts underpinning those cases are not materially similar to the case at bar and neither clearly establishes that a Fourth Amendment seizure occurred. In *Brendlin*, the Supreme Court merely held that when officers stop a car during a routine traffic stop, the driver and passengers alike are seized. 551 U.S. at 251, 127 S.Ct. at 2403. The Supreme Court never mentioned the use of deadly force, hostages, innocent bystanders, or any other facts that are remotely similar to the case at bar.

(Dkt. 52, pg. 7).

The law of the case doctrine precludes this Court from revisiting this conclusion. Under this doctrine, "the findings of fact and conclusions of law by an appellate court are generally binding in all subsequent proceedings in the same case in the trial court or on a later appeal." *This That And The Other Gift And Tobacco, Inc. v. Cobb Cty.*, 439 F.3d 1275, 1283 (11th Cir. 2006) (internal citations and quotations omitted). Furthermore, this "doctrine bars relitigation of issues that were decided either explicitly or by necessary implication." *Id.* It seems evident to this Court that the Circuit resolved the question, "either explicitly or by necessary implication," whether the Fourth Amendment was implicated in this case.

If the law of the case doctrine did not preclude this Court from addressing the question, then this Court would determine that no Fourth Amendment seizure occurred. As the Eleventh Circuit has already explained, an innocent bystander who is injured by police action is not seized for the purposes of the Fourth Amendment. In *Troupe v. Sarasota County*, 419 F.3d 1160 (11th Cir. 2005), a similar factual scenario, the Court explained that a bystander or hostage suffers no violation of his or her constitutional rights when injured in the course of a police response to a rapidly developing crime in the absence of an intent by the police to harm the person who is injured.

In *Troupe*, the target of a Sarasota County Sheriff's SWAT operation, Hart, fled the police in his car with two passengers when the police attempted to arrest him before he drove away from his house. *Id.* at 1164. As Hart drove away, one officer fired a shot in an attempt to disable the car that missed and another officer fired two shots at the car because he "believed [the vehicle] would run right through him in order to leave the scene." *Id.* One of the bullets fired went through the driver's side window and struck Hart in the back. *Id.* Hart continued a short distance before crashing into a concrete wall. *Id.* The front seat passenger died at the scene and the other passenger sustained serious injuries in the accident. *Id.* at 1165. The passengers' estate brought separate § 1983 actions against, among others, the Sarasota County Sheriff's Office and the officers based on alleged excessive force. *Id.* Defendants' motions for summary judgment were granted on all federal claims.

The Eleventh Circuit concluded the passengers were not "seized" under the Fourth Amendment when the officers fired at the car. *Id.* at 1167. The Eleventh Circuit recognized, "stopping a vehicle's driver does not constitute a seizure of a passenger. Thus, when [the officer]

10

shot Hart that did not constitute a seizure of the passengers." *Troupe*, 419 F.3d at 1167 (citing

*Lewis*, 523 U.S. at 844, and *Brower*, 489 U.S. at 596–97).

The Eleventh Circuit's decision comported with the decisions from other circuits. *See*

*Rucker v. Harford Cty.*, 946 F.2d 278 (4th Cir.1991) (explaining that the Fourth Amendment

provided no protection to innocent bystander injured by police bullet aimed at fleeing vehicle);

*Medeiros v. O'Connell*, 150 F.3d 164 (2nd Cir. 1998) (detailing that no Fourth Amendment

seizure occurred when officer shot a hostage); *Childress v. City of Arapaho*, 210 F.3d 1154, 1157

(10th Cir.2000) (concluding that no "Fourth Amendment seizure occurred" when a hostage was

injured by police bullet aimed at suspect); *Landol–Rivera v. Cruz Cosme*, 906 F.2d 791 (1st

Cir.1990) (holding that police shooting of hostage was not a Fourth Amendment seizure).

Cooper, however, insists that the Supreme Court's holding in *Brendlin* was a major

change in Fourth Amendment jurisprudence and now forecloses the City's argument that a

Cooper was not seized for Fourth Amendment purposes. In *Brendlin*, the Supreme Court

examined whether a passenger in a vehicle was seized during a traffic stop. The Court concluded

no distinction existed between the passenger and driver existed "that would affect the Fourth

Amendment analysis. *Id.* at 256. The *Brendlin* Court explained, "A person is seized by the police

and thus entitled to challenge the government's action under the Fourth Amendment when the

officer, by means of physical force or show of authority, terminates or restrains his freedom of

movement, *through means intentionally applied. Id.* at 254 (emphasis in original, internal

citations an quotations removed). Or in other words, "an unintended person may be the object of

the detention, so long as the detention is willful and not merely the consequence of an unknowing

act. *Id.* (internal quotation and editorial marks removed). Interestingly, the Supreme Court

11

observed, "But what may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away." *Id.* at 262.

There is, candidly, friction between *Brendlin* and *Troupe*, as the Eleventh Circuit appeared to recognize in the prior opinion in this case (Dkt. 52, pg. 7), regarding whether a Fourth Amendment seizure occurs when an officer shoots at a fleeing felon but wounds an innocent bystander. *See Gardner v. Bd. of Police Comm'rs*, 641 F.3d 947 (8th Cir. 2011) (observing that "*Brendlin* seemed to steer the analysis toward an inquiry into 'objective intent,' but the opinion did not disavow statements in *Brower* that led lower courts and commentators to focus at some level on the subjective intent of the officers."); *Cox v. Village of Pleasantville*, 11-CV-6516, 2017 WL 4286645, *10-11 (S.D.N.Y. Sept. 26, 2017) (recognizing "tension" between Second Circuit precedent and *Brendlin* on the question of whether Fourth Amendment seizure occurred when a hostage was wounded by a police bullet and concluding that "a victim of a shooting is not seized if the victim was not the intended target of the force."). This issue will, no doubt, be resolved in greater clarity in the future. Until that time, however, this Court will not contravene the Eleventh Circuit determinations in *Troupe* that the Fourth Amendment provided no protection to innocent bystander injured when the police attempted to seizure of a fleeing felon.

**Count II**

The City maintains that regardless of what may be thought now of the various JSO officers' "in the moment" actions, absent any evidence that the officers intended to harm Cooper

12

and/or her son–and there is none–Count II does not establish a claim under the Fourteenth
Amendment.

"The Fourteenth Amendment of the United States Constitution protects against
deprivation by state action of a constitutionally protected interest in 'life, liberty, or property'
without the due process of law." *Maddox v. Stephens*, 727 F.3d 1109, 1118 (11th Cir. 2013). The
Supreme Court has "emphasized time and again that '[t]he touchstone of due process is
protection of the individual against arbitrary action of government,' . . . ." *County of Sacramento
v. Lewis*, 523 U.S. 833, 845 (1998) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974)).

To prevail against a municipality in a 42 U.S.C. § 1983 suit, a plaintiff must first show a
deprivation of a right secured by the Constitution and laws of the United States. Only after such a
deprivation is shown, must a plaintiff prove that an official "custom" or "policy" was the
"moving force" behind the violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-94
(1978). "Congress did not intend municipalities to be held liable unless action pursuant to official
policy of some nature caused a constitutional tort." 436 U.S. at 691.

Cooper maintains the City failed to adequately train and instruct its JSO officers
regarding the discharge of firearms when hostages are present, particularly when shooting into a
vehicle. While it is true that municipality may be liable "if it had a policy or custom of failing to
train its employees and that failure to train caused the constitutional violation.'" *Garczynski v.
Bradshaw*, 573 F.3d 1158, 1170 (11th Cir. 2009) (quoting *Collins v. City of Harker Heights*, 503
U.S. 115, 123 (1992)).  Importantly, however, "[s]ection 1983 liability only attaches where the
failure to train amounted to deliberate indifference to the rights of persons with whom the police

13

come into contact. Analysis of a state entity's custom or policy is unnecessary, however, when no constitutional violation has occurred." *Id.* (internal citations and quotations removed).

When, as in this case, no constitutional violation has occurred, an analysis of the City's custom or policy, or lack thereof, is not relevant or appropriate. *See Garczynski v. Bradshaw*, 573 F.3d 1158, 1170–71 (11th Cir. 2009); *Rooney v. Watson*, 101 F.3d 1378, 1381-82 (11th Cir. 1996). The City, consequently, is entitled to summary judgment on Count II.

**Counts III and IV**

As a Florida municipality, the City maintains it is only liable in tort only when it has waived sovereign immunity. Further, no liability attaches to the consequences of discretionary police actions. The facts of this case are that the officers' actions on March 26, 2010, were discretionary, and the City is immune from Plaintiff's state law claims.

"How a governmental entity, through its officials and employees, exercises its discretionary power to enforce compliance with the laws duly enacted by a governmental body is a matter of governance, for which there never has been a common law duty of care." *Trianon Park Condo. Ass'n, Inc. v. City of Hialeah*, 468 So. 2d 912, 919 (Fla. 1985). "Thus, there is no governmental liability where an officer exercises his discretion not to make an arrest. However, when an officer acts to enforce the law, Florida law has consistently recognized that a special relationship may arise between an officer and a tort victim when the officer's conduct creates a foreseeable zone of risk to a determinate individual or group." *Labance v. Dawsy*, 14 So. 3d 1256, 1259 (Fla. Dist. Ct. App. 2009) (internal citation removed).

Sovereign immunity, as the Florida Supreme court has explained shields "discretionary" but not "operational" acts. *City of Pinellas Park v. Brown*, 604 So. 2d 1222, 1226 (Fla. 1992)

14

(citing *Kaisner v. Kolb*, 543 So. 2d 732 (Fla. 1989)). An act is considered "operational if it is one not necessary to or inherent in policy or planning, that merely reflects a secondary decision as to how those policies or plans will be implemented." *Id.* (emphasis in original). Discretional acts, by contrast, "involve an exercise of executive or legislative power such that, for the court to intervene by way of tort law, it inappropriately would entangle itself in fundamental questions of policy and planning." *Id.*

"In *Commercial Carrier,* this Court enunciated the abiding test for determining whether a governmental entity enjoys sovereign immunity notwithstanding the otherwise broad waiver present in section 768.28, Florida Statutes. Despite the absence of an express discretionary-function exception within the statute itself, we held that the separation-of-powers provision present in article II, section 3 of the Florida Constitution requires that "certain [quasi-legislative] policy-making, planning or judgmental governmental functions cannot be the subject of traditional tort liability." 371 So.2d at 1020." *Wallace v. Dean*, 3 So. 3d 1035, 1053 (Fla. 2009).

"*Planning level functions* are generally interpreted to be those requiring basic policy decisions, while *operational level functions* are those that implement policy." *Wallace v. Dean*, 3 So. 3d 1035, 1053 (Fla. 2009) (emphasis in original). In other words, "[g]overnmental acts are discretionary and immune . . . if they involve an exercise of executive or legislative power such that, for the court to intervene by way of tort law, it inappropriately would entangle itself in fundamental questions of policy and planning." *City of Pinellas Park v. Brown*, 604 So. 2d 1222, 1226 (Fla. 1992) (omitting internal citation and quotation).

The City points to *Robles v. Metropolitan Dade County*, 802 So. 2d 453 (Fla. 3d DCA 2001), for the proposition that the JSO officers' actions were discretionary entitling the City to

15

immunity. *Robles* involved a minor child who was injured when a police officer shot a school bus hijacker. *Id.* at 454. The minor's parents brought a personal injury action based on the police officer's alleged negligence in shooting the hijacker, but summary judgment was entered for the County. *Id.* at 453.

The hijacker boarded a school bus and threatened the children and adult occupants. *Id.* at 454. The hijacker's threats made the adults on the bus think he was "armed and that he was potentially carrying a bomb or other explosive device." *Id.* The authorities were altered to this situation, and a police sharpshooter responded. After the hijacker made "a sudden unexpected move with his hands," the sharpshooter shot the hijacker. *Id.* The minor's eye was injured by debris "thrown off by the gunshot." *Id.*

In affirming the summary judgment for the County, the Robles Court was guided by the Supreme Court of Florida's admonitions that "'certain police actions may involve a level of such urgency as to be considered discretionary and not operational,'" and "that the circumstances which would allow sovereign immunity to occur were such that the 'serious emergency must be one thrust upon the police by lawbreakers or other external forces, that requires them to choose between different risks posed to the public.'" *Id.* at 454-55 (quoting *Pinellas Park*, 604 So. 2d at 1227).

This Court agrees with the City that on March 26, 2010, the JSO officers responded to an emergency situation where "no matter what decision police officers make, someone or some group will be put at risk; and the officers thus are left no option but to choose between two different evils." *Pinellas Park*, 604 So. 2d at 1227. Consequently, the City is entitled to sovereign

16

immunity on Counts III and IV because the officers' actions involved "discretionary act[s] of executive decision making." *Id.*

Accordingly, it is hereby **ORDERED**:

1. "Defendant Sheriff Williams' Motion for Summary Judgment and Supporting Memorandum of Law" (Dkt. 97) is **GRANTED**;

2. "Joint Motion for Extension of Time to File Pre-Trial Stipulation and Motions in Limine" (Dkt. 121) is **DENIED**; and

3. The Clerk is directed to enter Judgment in favor of Defendant and to **CLOSE** this case.

**DONE and ENTERED** at Jacksonville, Florida this *15* day of November, 2017.

HARVEY E. SCHLESINGER
UNITED STATES DISTRICT JUDGE

Copies to:
William Sheppard, Esq.
Matthew Kachergus, Esq.
Bryan DeMaggio, Esq.
Stephen Powell, Esq.